**UNITED STATES of America**

**v.**

**Robert SULLIVAN et al.**

**Crim. No. 83–295–G.**

United States District Court,
D. Massachusetts.

May 10, 1984.

Edward Gargiulo, Boston, Mass., for Greg Gianpappa.

Karnig Boyajian, Boston, Mass., for Albion Loud.

Michael J. Splaine, Danvers, Mass., for Joseph Perkins.

Leonard Kopelman, Richard Fallon, Boston, Mass., for Gerald McGillvray.

John J. Ruby, Jr., Boston, Mass., for Steven Kalil.

Michael Reilly, Haussermann, Davison & Shattuck, Boston, Mass., for Richard Duarte.

Joseph M. Flak, Gerald Alch, Boston, Mass., for Michael Dezotel.

George F. Gormley, Boston, Mass., for Floyd Whiteside.

Willie Davis, Boston, Mass., for Abdallah Moaud Melhem.

Paul W. Shaw, Boston, Mass., for Abdo Abouzeid.

Martin K. Leppo, Boston, Mass., for Antoine Abouzeid.

Edward Gottlieb, Boston, Mass., for John Sullivan.

Owen Walker, Federal Defender's Office, Boston, Mass., for Paul O'Malley.

Angelo P. Catanzaro, Catanzaro & Effren, Boston, Mass., for Paul Sullivan.

Gary C. Crossen, Oliver C. Mitchell, Jr., Boston, Mass., for the U.S.

## MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS

GARRITY, District Judge.

Pursuant to 18 U.S.C. § 2518(10)(a)(i) several defendants have moved to suppress evidence [1] obtained through a series of

Kevin J. O'Dea, Boston, Mass., for Robert Sullivan.

---

1. The defendants began filing their instant motions to suppress on March 22, 1984, after the deadline set by the court for filing such motions had passed. The trial of four of the moving defendants had previously been scheduled to begin on May 9, 1984. The defendants explained that they were first notified by the government of the previous application naming Rob rt Sullivan on or about March 16, 1984 and were thus unaware of the grounds for their motions until that time. The court held a hearing on the motions on April 20, 1984, after which the government was ordered to file affidavits from all individuals with personal knowledge of facts relevant to the motions. Various individuals from Boston and Washington, D.C. filed affidavits. The court then held a second hearing on April 27, 1984, during which the defendants and the government argued the factual and legal merits of the suppression mo-

wiretaps, on the ground that the government violated 18 U.S.C. § 2518(1)(e) when it failed to disclose a previous application for electronic surveillance in which one of the defendants, Robert Sullivan, was a named interceptee.[2] The government admits that it failed to disclose this required information. However, it contends that § 2518(1)(e) was not violated because the Assistant United States Attorney who applied for the wiretaps did not know about the previous application. As a fallback position the government argues that the wiretap evidence should not be suppressed even if there was a violation of § 2518(1)(e).

## I.

On April 6 and May 13, 1983 Assistant United States Attorney Crossen applied for and was granted authority to conduct electronic surveillance pursuant to 18 U.S.C. §§ 2510–20, by United States District Judges Skinner and Mazzone, respectively. Prior to these applications Crossen made several inquiries to determine whether any of the persons, facilities or places specified in his applications had been the subject of previous applications for electronic surveillance.

One of Crossen's inquiries was directed to the New England Organized Crime Strike Force ("the Strike Force"). From January through May, 1981, the Strike Force and the FBI had conducted court-authorized electronic surveillance of two locations in Boston's North End, 98 Prince Street and 51 North Margin Street. This judge authorized and received reports concerning those surveillances. All the surveillance orders for Prince Street were designated M.B.D. No. 81–12 by the district court clerk's office. Illario Zannino, among others, was a named interceptee in the Prince Street orders. Robert Sullivan was neither named nor intercepted during that surveillance. The original surveillance order for North Margin Street was designated M.B.D. NO. 81–38. Zannino, among others, again was a named interceptee. Robert Sullivan was not named in that order; he was present, however, when other persons were intercepted and may have been intercepted himself.[3] Two orders extending surveillance of North Margin Street were designated M.B.D. No. 81–127. These orders added Robert Sullivan as a named interceptee. All this information was readily available in the Strike Force files.

Crossen was aware of the Strike Force's North End investigation but he knew none of the specifics. In late March or early April of 1983, he asked his superior, Assistant United States Attorney Boudreau, who had been a trial attorney with the Strike Force, to inquire whether Zannino and any of the persons specified in Crossen's appli-

tions. The Boston affiants were available for cross-examination at the second hearing, but they were never called to testify. The facts recited in the text are based on the government affidavits. The government and several moving defendants have filed legal memoranda.

Although the defendants did not specifically request one, the court considered whether a full evidentiary hearing was required. The government's affidavits are sufficiently detailed, in our view, to resolve this issue fairly and expeditiously without such a hearing. *Cf. United States v. Loving,* 8 Cir.1976, 539 F.2d 1174; *United States v. Cirillo,* 2 Cir.1974, 499 F.2d 872, 880–881.

**2.** Section 2518(10)(a)(i) authorizes defendants to move for suppression of unlawfully intercepted communications. Defendants Robert Sullivan and Floyd Whiteside also rely on § 2518(10)(a)(ii), claiming that the surveillance authorization was "insufficient on its face." There is no merit to this claim. *See United*

*States v. Harvey,* S.D.Fla.1982, 560 F.Supp. 1040, 1071.

Section 2518(1)(e) requires each application for electronic surveillance to include:
  a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application.

**3.** Some intercepted voices cannot be identified. One of them possibly is Robert Sullivan. Sullivan received an inventory in August 1982, pursuant to 18 U.S.C. § 2518(8)(d), notifying him that he was named and/or intercepted in both M.B.D. No. 81–38 and M.B.D. No. 81–127.

cation, including Robert Sullivan, had been intercepted during the North End investigation. According to Crossen's affidavit, he furnished Boudreau with a list of all the soon-to-be named interceptees (five in number) and Zannino.[4] According to Boudreau's affidavit, Crossen asked him only to inquire about three persons, Zannino, Robert Sullivan and Richard Sullivan. Boudreau's affidavit states that he contacted Kathleen Reilly, a paralegal assigned to the Strike Force, and asked about the three individuals. According to Ms. Reilly's affidavit, Boudreau requested information about the Prince Street and North Margin Street surveillances. She remembers him mentioning Zannino but not the Sullivans.[5]

Ms. Reilly was familiar with the Prince Street (M.B.D. No. 81–12) and North Margin Street (M.B.D. No. 81–38) surveillances. She provided Boudreau with information about them which was included in Crossen's application. Ms. Reilly did not know, however, that M.B.D. No. 81–127, which named Robert Sullivan, extended the surveillance of North Margin Street originally authorized by M.B.D. No. 81–38. Thus the information Crossen received from the Strike Force, through Boudreau, contained no reference to M.B.D. No. 81–127 or to Robert Sullivan.

In addition to inquiring with the Strike Force, Crossen requested DEA Special Agent Reilly, who was the chief law enforcement officer on the *Sullivan* investigation, to check with the Electronic Surveillance Sections ("Elsur Sections") of the DEA and the FBI to determine whether any of the named interceptees had been the subject of previous applications. Elsur Sections are located in Washington, D.C. and maintain records of electronic surveillance applications by law enforcement agencies. The Boston office of the FBI also maintains records of local FBI applications.

In March 1983 Agent Reilly called DEA's Elsur Section and requested a check on all the named interceptees.[6] He was informed that there was no record of previous DEA electronic surveillance of any of the named interceptees. It is undisputed that none of the named interceptees had been the subject of DEA conducted surveillance.

In order to check for previous FBI conducted surveillance, Agent Reilly contacted

**4.** It is unclear why Crossen inquired about previous applications naming Zannino since Zannino was not named in Crossen's application. *See United States v. Abramson,* 8 Cir.1977, 553 F.2d 1164, 1169 (suggesting that only previous applications naming targets of subsequent application need be disclosed). At oral argument Crossen seemed to attribute his inquiry to an abundance of caution because he believed Zannino was involved in Robert Sullivan's illegal activities. The defendants contend, however, that Crossen recited the previous applications naming Zannino without adequately explaining their connection to the persons, facilities or places specified in his applications. Defendants speculate that Crossen wished to "sensationalize" his application by including repeated references to Zannino. If this were true, suppression might be warranted under *United States v. Swanson,* D.Nev.1975, 399 F.Supp. 441, 445, where the court held that the inclusion of a previous application with no apparent connection to the subsequent application violated § 2518(1)(e). The affidavits supporting Crossen's applications, however, adequately connect Robert Sullivan to Zannino. For example, pen registers on two telephones used by Sullivan recorded 18 calls to Zannino's residence during a five month period. In addition, Zannino's wife and other members of his family own real property throughout Boston's South End, which is Sullivan's purported area of operations, including the space occupied by Bobby O's Villa, which is Sullivan's purported headquarters. Finally, Sullivan allegedly admitted to a DEA undercover agent that "Baione" (Zannino's alias) was one of the "top men in the area" and a personal friend of Sullivan's. In light of these facts and others, Crossen's recitation of the previous Zannino applications, though probably not required, was not violative of the statute.

**5.** According to Ms. Reilly's affidavit, Boudreau stated that he believed Zannino might be intercepted during an upcoming surveillance by the U.S. Attorney's Office and that he knew Zannino had been intercepted at both North End locations. Boudreau also requested information about a 1975 surveillance after Ms. Reilly reminded him that Zannino had been a target of that surveillance. The 1975 surveillance was included in Crossen's application.

**6.** There is no record of Reilly's inquiry. Until recently, the DEA's Elsur Section did not always document such inquiries. The DEA's Elsur coordinators do not remember the inquiry.

John Brady of the Boston office of the FBI, who was the FBI's Liaison Agent with the Boston office of the DEA. On September 22, 1982 Agent Reilly submitted a written request for a file check on Robert Sullivan, Richard Sullivan, James Sullivan and Charles Nohmy. Brady checked the FBI files and reported that "FBI files contain references to the Sullivan's [sic]. No main investigations." Brady provided additional information on each of the specified Sullivans, including physical descriptions and arrest records. (There were no FBI files regarding Nohmy.)

Agent Reilly erroneously assumed that FBI file checks automatically encompass checks of the FBI's Elsur Section files, as is the case with DEA file checks. He therefore understood "[n]o main investigations" to mean that none of the Sullivans had been the subject of previous FBI electronic surveillance applications. In fact, the FBI's Elsur Section files contained information about M.B.D. No. 81–127, the North Margin Street surveillance order in which Robert Sullivan was a named interceptee.[7] That information, if known, should have been included in Crossen's application.

## II.

The government argues that there was no § 2518(1)(e) violation because AUSA Crossen, despite earnest efforts, never learned of the prior application naming Robert Sullivan. As the court said in *United States v. Harvey*, S.D.Fla. 1982, 560 F.Supp. 1040, 1073 (emphasis in original):

> The Government cannot be required to disclose something its agents do not know. Acceptance of Harvey's arguments in this regard would in effect impose a duty upon the Government agents to conduct a full investigation to ascertain the details and particulars of all prior investigations, a proposition neither

the Act nor the case law supports. Section 2518(1)(e) requires only that the application contain a "full and complete statement of the facts concerning all previous applications *known to the individual*" making the application.

The *Harvey* case concerned the federal government's failure to disclose the target of a previous *state* application. Its analysis loses some force when applied to a previous federal application, as the information is both theoretically and practically easier to obtain. In the instant case, for example, information about M.B.D. No. 81–127 was readily available in both the FBI and Strike Force files.

The defendants would have us charge Crossen with constructive knowledge of this information. The federal government is a single entity, they argue, and a federal prosecutor applying for an electronic surveillance order should be deemed to "know," for purposes of § 2518(1)(e), of all previous applications by federal law enforcement authorities. The defendants' approach, however, misreads the statute's language. If Congress had intended to require the government to disclose all previous federal applications it could have said so. Instead Congress focused on a subset thereof, namely, those previous applications *known* to the applying individual. Of course an applicant cannot intentionally or even recklessly remain ignorant of previous applications and expect to satisfy the requirements of § 2518(1)(e). He must undertake a reasonable investigation to determine whether any of the persons, facilities or places specified in his application were the subjects of previous applications. The reasonableness of such an investigation will depend on the circumstances of each case.

In the instant case AUSA Crossen relied on Agent Reilly and AUSA Boudreau to

---

7. In addition to the inquiries directed to federal agencies, Crossen contacted the Suffolk County District Attorney's Office. Having worked there for four years as an Assistant District Attorney, he was aware that Zannino, Robert Sullivan and others had been intercepted in an electronic surveillance investigation conducted by state law enforcement authorities. The District Attorney's Office provided Crossen with information about that investigation which was included in his application.

conduct the investigation. Such reliance was reasonable. Agent Reilly had been a DEA agent for over eleven years and was the case agent on the Sullivan investigation. AUSA Boudreau was Crossen's superior at the U.S. Attorney's Office and a former trial attorney with the Strike Force. Both men made good faith efforts to identify all relevant previous applications. They successfully identified two out of three. Agent Reilly missed M.B.D.No. 81–127 because he mistakenly assumed FBI Liaison Agent Brady would check the FBI's Elsur Section files as part of his general file check on the Sullivans. AUSA Boudreau missed M.B.D. No. 81–127 because either he neglected to mention Robert Sullivan's name to the Strike Force paralegal or the paralegal was unaware that M.B.D. No. 81–127 was part of the North End investigation. Unfortunately, the results of Reilly's and Boudreau's inquiries reinforced one another, leaving Crossen with the impression that there were no previous federal applications naming Robert Sullivan.

■ The government cannot escape its disclosure obligation under § 2518(1)(e) by blithely asserting that a previous application "fell through the cracks." Both the defendants and this court deserve an explanation. In this case, the government's explanation was adequate. The omission in Crossen's application was due to a coincidence of errors that at most should be characterized as negligent, rather than intentional or reckless. Under the circumstances, Crossen and his delegates, Agent Reilly and AUSA Boudreau, did what was required of them under § 2518(1)(e).

Our ruling today does not mean, as the defendants suggested at oral argument, that the government could hire an unsuspecting lawyer and have him make a wiretap application that disclosed only those previous applications actually known to him. Even a freshly hired applicant must undertake a reasonable investigation of possible previous applications. Moreover, the defendants' hypothetical involves intentional concealment by the government. There is no evidence in this case that the government intentionally concealed information from the court.[8] If such a showing had been made, we would have a different case. See *United States v. Donovan,* 1976, 429 U.S. 413, 436 n. 23, 97 S.Ct. 658, 672 n. 23, 50 L.Ed.2d 652. Crossen's application identified two of the three North End wiretaps and a state surveillance of Robert Sullivan. In light of these disclosures, no inference that the government was trying to hide any previous interceptions is justified. See *United States v. Sklaroff,* 5 Cir.1977, 552 F.2d 1156, 1160 (no inference of concealment when government disclosed three previous applications but omitted fourth).

The defendants next contend that Assistant Attorney General D. Lowell Jensen, who authorized the instant electronic surveillance applications, "knew" of the previous application naming Robert Sullivan and violated § 2518(1)(e) when he failed to disclose that information. Since there is no evidence that Jensen had personal knowledge of the previous application, defendants' argument seems to be that Jensen was required to undertake a reasonable investigation of previous applications similar to that undertaken by Crossen.

■ The language of the statute does not make clear who is charged with the duty to disclose previous applications. Section 2518(1)(e) refers to the "individual authorizing and making the application." Under the statute, however, the authorizing individual is a senior Justice Department

**8.** At oral argument the defendants speculated that the ongoing North End investigation was so important, and the Strike Force so security conscious, that it was decided not to disclose the existence of M.B.D. No. 81–127 to Crossen. Such speculation is belied by the facts. First, the Strike Force provided Crossen with information about M.B.D. No. 81–12 and M.B.D. No. 81–38, two of the three North End surveillances.

Second, the Strike Force had nothing to do with Agent Reilly's failure to discover M.B.D. No. 81–127. Third, the existence of M.B.D. No. 81–127 was a matter of public record. In August 1982 a story appeared in the Boston Globe reporting that Robert Sullivan had received an inventory notifying him that he had been named and/or intercepted in both M.B.D. No. 81–38 and M.B.D. No. 81–127.

official and the applying individual usually is an Assistant United States Attorney. In *United States v. Turner,* 9 Cir.1975, 528 F.2d 143, 153, the court construed this ambiguous language to require disclosure by the applying rather than the authorizing individual. The court stated:

> The [disclosure] requirement seeks to ensure that the judge receives a full and complete report with respect to previous interceptions and the extent of information obtained thereby so that he can decide whether there is need for the further interception sought and whether there is probable cause to believe that further interception would provide seizable evidence. It is revelation of information that this paragraph seeks, and not demonstrable exercise of authority. The latter was accomplished by the Attorney General's authorization .... The authorizing officer is not the primary source of knowledge in this area. Whatever enlightenment he could give the court would be second-hand.

We agree. The Assistant Attorney General's role in the application process is to provide the mature judgment of a politically responsible official that electronic surveillance is justified in a particular situation. *See United States v. Giordano,* 1974, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341. In performing that role he must be able to rely on the information contained in the applications submitted to him. Section 2518(1) prescribes various types of information that must be included in each application. Nothing in the statute or the case law requires the Assistant Attorney General to verify this information. In the instant case Assistant Attorney General Jensen properly relied on Crossen's representation regarding previous applications.

For the foregoing reasons, there was no violation of § 2518(1)(e).

### III.

Having decided that there was no violation of § 2518(1)(e), we ordinarily would not reach the government's fallback position, that suppression is not warranted even if there were a violation. However, because the § 2518(1)(e) issue involves a question of law on which the Court of Appeals for this Circuit has yet to speak, we shall address the suppression issue as well.

### A.

■ Not every failure to comply fully with the requirements of Title III renders the interception of wire or oral communications "unlawful" for purposes of Section 2518(10)(a)(i). *United States v. Chavez,* 1974, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380. "To the contrary, suppression is required only for a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano,* 1974, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341; *United States v. Donovan,* 1977, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652. Courts have indicated that suppression may also be ordered where there is an intentional failure on the part of the government to comply with any Title III requirement. See *Donovan, supra; United States v. Harrigan,* 1 Cir.1977, 557 F.2d 879.

■ Regarding the first ground for suppression, whether a statutory requirement "directly and substantially implements congressional intention" can be determined in either of two ways: first, by ascertaining whether the information required by the particular provision plays a "substantive role" with respect to judicial authorization of the tap; and second by looking to see whether the legislative history indicates that Congress intended the provision to play "a central, or even functional role in guarding against unwarranted use of wiretapping or electronic surveillance." *Chavez, supra, Donovan, supra.* The "substantive role" criterion is met by showing that the information to be provided would detract from the sufficiency of the factors which the issuing judge must find to be

present if a wiretap order is to issue, namely:

> that normal investigative techniques have failed or are unlikely to succeed and there is probable cause to believe that
> (i) an individual is engaged in criminal activity;
> (ii) particular communications concerning the offense will be obtained through interception; and
> (iii) the target facilities are being used in connection with specified criminal activity.

*Donovan, supra* at 435, 97 S.Ct. at 672, §§ 2518(3)(a–d). In the instant case, it is clear that § 2518(1)(e) does not play a substantive role, for there was ample evidence before both Judges Skinner and Mazzone to find that these conditions had been met, and had the information been provided to the judges that defendant Sullivan had been a named interceptee on the North Margin Street tap, their decisions would not have been affected. Indeed, it is more likely that the information would have supplemented the evidence in favor of issuing the tap, rather than detracted from it.

As for the centrality of the provision in guarding against unwarranted use of wiretapping, the legislative history is of minimal assistance, since what little there is does not amplify the substance of the provision itself. Despite the lack of legislative history, however, the Court of Appeals for the District of Columbia Circuit has held that § 2518(1)(e) directly and substantially implements Congressional intent in limiting the use of wiretapping. *United States v. Bellosi*, D.C.Cir.1974, 501 F.2d 833. In *Bellosi*, the government failed to disclose in an application for a wiretap that a named interceptee had been a target in a prior tap on an unrelated crime. The court held that the omission constituted a violation of § 2518(1)(e) despite the difference in the purpose of the taps.

■ In determining whether suppression was the appropriate remedy for the violation, the *Bellosi* court considered the various purposes Congress could have intended the requirement to serve: to enable the issuing judge to determine the frequency with which the named interceptees had been targets of electronic surveillance; to inform the judge of the limiting conditions and other aspects in the decisions of prior issuing judges; to enable the judge to ascertain the probable success of the present tap by learning the extent of significant evidence obtained from prior taps on the particular individual; and finally, to enable the judge to ascertain in the circumstances when the evidence from the prior tap was suppressed, whether the evidence supplied for the present tap was derived from the tainted evidence of the prior tap. In sum, the disclosure requirement of § 2518(1)(e) serves the important purpose of helping to ensure that "judges obtain the information they need to determine whether law enforcement authorities are being overzealous in their efforts to employ wiretapping and electronic surveillance in situations where a lesser intrusion on privacy would serve the investigative need." *Bellosi* at 841. Furthermore, "since the Government could well anticipate judicial approval of a higher proportion of its intercept applications if, as here, it could selectively choose not to disclose previous applications ... the Government would be tempted to misrepresent previous applications for interceptions involving the same persons, facilities, or places." As such, the *Bellosi* court concluded that the disclosure requirement of § 2518(1)(e) directly and substantially implements congressional intent to limit wiretapping, and thus failure to comply with the requirement requires suppression.

Three years after the *Bellosi* opinion, the Court of Appeals for the Eighth Circuit reached the contrary result in *United States v. Abramson*, 1977, 553 F.2d 1164. In the *Abramson* case, the government did disclose a prior application in its new application, but did not disclose that the evidence from the prior application had been suppressed.[9] The court held that "the vol-

9. The disclosure of the prior tap was technically not required because none of the named inter-

untary disclosure without mention of the suppression was not a full and complete statement of the facts and hence constituted noncompliance with Section 2518(1)(e)." Nevertheless, the court denied the motion to suppress on the ground that "the failure to disclose the prior suppression did not detract from the sufficiency of the enumerated factors necessary to a judge's wiretap authorization and hence was not central or functional in guarding against unwarranted use of wiretapping or electronic surveillance." *Abramson* at 1170.

In reaching this conclusion, the *Abramson* court relied heavily on the intervening decision in *United States v. Donovan*, 1977, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652. *Donovan* concerned a different provision in Title III, the requirement that an application for an intercept order identify those persons the government has probable cause to believe are committing the offense and whose communications are expected to be intercepted. Section 2518(1)(b)(iv). The government had violated this provision by disclosing the principal targets of the investigation, rather than all those who fell under § 2518(1)(b)(iv).

In deciding that the violation did not require suppression, the Supreme Court first determined that § 2518(1)(b)(iv) did not play a substantive role with respect to judicial authorization of intercept orders. The failure to name additional targets, the Court decided, "in no way detracts from the sufficiency of the statutory factors."

The Court then compared the facts in *Donovan* to those in two prior Title III violation cases, *Giordano* and *Chavez*. In *Giordano* the government violated § 2516(1), the provision requiring that an application for an intercept order be approved by the Attorney General or a specially designated Assistant Attorney General. The Supreme Court held that proper approval from a senior official in the Justice Department was a statutory precondition to judicial authorization, and failure to

obtain such approval requires suppression. In *Chavez*, the government had obtained the proper approval, but had merely misidentified the approving officer in the wiretap application. In that case, the Court held that suppression was not warranted because all of the statutory preconditions had been satisfied. After comparing the effect of failing to comply with the identification requirement in 2518(1)(b)(iv) with the effect of noncompliance with the provisions in *Giordano* and *Chavez*, the *Donovan* Court concluded that the identification requirement was not a statutory precondition such as the approval by the Attorney General; rather, the failure to identify all targets was more analogous to the misidentification in *Chavez*, and thus suppression was not required.

■ Finally, the Supreme Court noted that nothing in the legislative history suggests that the identification requirement was intended to play a central or functional role in guarding against unwarranted use of wiretapping. Unlike the *Bellosi* court, the *Donovan* Court did not speculate on the purposes Congress intended the identification requirement to serve. Rather, the Court explained, "even if we assume that Congress thought that a broad identification requirement was constitutionally mandated, it does not follow that Congress imposed *statutory* suppression ... as a sanction for noncompliance." *Donovan, supra* 429 U.S. at 437, n. 25, 97 S.Ct. at 673, n. 25 (emphasis in original). The key to determining whether suppression is required, in the absence of legislative history, is whether the disclosure requirement plays a substantive role in judicial authorization.

In limiting use of the intercept procedure to "the most precise and discriminate circumstances," S.Rep. No. 1097, 90th Cong., 2d Sess., 102 (1968), Congress required law enforcement authorities to convince a district court that probable cause existed to believe that a specific

ceptees of the new application were *named* in the prior tap. Some of the targets had, however, been *intercepted* in the prior tap.

person was committing a specific offense using a specific telephone. . . . Nothing in the legislative history indicates that Congress intended to declare an otherwise constitutional intercept order "unlawful" under § 2518(10)(a)(i)—resulting in suppression under § 2515—for failure to name additional targets.

*Donovan* at 437–438, n. 25, 97 S.Ct. at 673, n. 25.

■ It is difficult to see how suppression could be required for noncompliance with § 2518(1)(e) when it is not required for a violation of § 2518(1)(b)(iv). Disclosure of prior applications naming those individuals who are targets of a new investigation necessarily depends on the naming of the targets in the new application. If failure to name target Smith in a wiretap application would not require suppression, then failure to disclose prior applications in which Smith was a named interceptee should not require suppression. In light of the holding in *Donovan*, and the absence of legislative history regarding the provision, we hold that the government's inadvertent violation of § 2518(1)(e) does not automatically require suppression.

### B.

The above analysis assumes that the nondisclosure by the government was unintentional. Where there is a showing that the noncompliance is intentional, the result may be different, and suppression may be ordered. *See Donovan, supra*, at 436 n. 23, 97 S.Ct. at 672 n. 23 ("There is no suggestion in this case that the Government agents knowingly failed to identify respondents . . . for the purpose of keeping relevant information from the District Court that might have prompted the court to conclude that probable cause was lacking. If such a showing had been made, we would have a different case.")[10] The Court of Appeals for the First Circuit, in *United States v. Harrigan*, 1 Cir.1977, 557 F.2d 879, has gone further than the Supreme Court, declaring that "suppression

should be required when the statutory violation arose from a conscious decision by the federal authorities to violate the law . . . . The unseemliness of government officials deliberately disobeying the law is obvious. In our view, the interest of deterring it outweighs the costs of excluding the evidence." *Harrigan* at 884–885. Arguably, the same should hold true where the government's noncompliance with Title III is the result of recklessness, especially since defendants will rarely, if ever, be able to show intentional misconduct on the part of the government. Courts, however, do not seem to have decided this issue yet.

In our opinion, the standard derived from such cases as *Harrigan, Bellosi* and *Abramson* should be whether the government intentionally or recklessly failed to comply with § 2518(1)(e) in preparing its wiretap application. *Cf. Franks v. Delaware*, 1978, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (intentional or reckless false statement in warrant affidavit may require suppression). Application of such a standard demands an analysis of the particular circumstances of each case. As explained *ante*, the evidence in this case does not support the contention that the government's actions were either intentional or reckless. The failure to disclose the prior application naming Robert Sullivan was the result of two unconnected slip-ups. Thus, even if the government's error constituted a violation of § 2518(1)(e), we rule, as an alternative ground for denying the defendants' motions, that suppression is not required.

---

10. In *Bellosi* and *Abramson*, however, the courts' rulings on the motions to suppress did not rely on the intentional noncompliance by the government with Title III requirements.