**UNITED STATES of America,**

v.

**Joseph MASSINO and Salvatore Vitale, Defendants.**

No. SSS 81 Cr. 803 (RWS).

United States District Court, S.D. New York.

Feb. 19, 1987.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for U.S.; Helen Gredd, Michael Chertoff, Asst. U.S. Attys., of counsel.

David Breitbart, New York City, for defendant Joseph Massino.

Slotnick, Cutler & Baker, New York City, for defendant Salvatore Vitale; Barry Ivan Slotnick, Mark M. Baker, Bruce Cutler, of counsel.

## OPINION

SWEET, District Judge.

By letter dated November 10, 1986, defendant Salvatore Vitale ("Vitale") has moved to suppress electronically intercepted conversations on the grounds that Special Agent Donald W. McCormick ("McCormick") of the Federal Bureau of Investigation ("FBI") perjured himself on succeeding applications for electronic eavesdropping authority. On December 22, 1986, this court ordered an evidentiary hearing on the issue of whether McCormick knew that the subjects of the proposed FBI surveillance were named interceptees in prior electronic surveillance by the Queens County District Attorney's office. That hearing was held on February 13 and 17, 1987, and included McCormick and Bruce Mouw ("Mouw"), his supervisor, as witnesses. Based on the findings of fact and conclusions of law as set forth below, the motion to suppress is denied.

**Findings of Fact**

Special Agent McCormick has been a member of the FBI squad investigating the Gotti/Fatico crew of the Gambino crime family since March of 1981. At the time of the affidavits in question, McCormick was, in his own words, "knowledgeable" on the subject of the Gambino crime family.

On November 9, 1981, McCormick submitted the first of a series of affidavits in connection with applications to judges in the Eastern District of New York for authority to intercept wire and oral communications at the residence of Angelo Ruggiero ("Ruggiero"). That affidavit and application resulted in an order signed on November 9, 1981 by the Honorable Henry Bramwell authorizing the interception of wire communications of Ruggiero, John Gotti, Eugene Gotti, Frank Guidici ("Guidici"), and Jackie Cavallo. Similar orders were signed by the Honorable Joseph M. McLaughlin on December 29, 1981, the Honorable Henry Bramwell on February 4, 1982 and April 5, 1982, the Honorable Edward R. Neaher on May 7, 1982, and the Honorable Henry Bramwell on June 7, 1982, based on subsequent affidavits submitted by McCormick. Although certain names were added to and removed from consecutive orders, Ruggiero, John Gotti, and Eugene Gotti were named interceptees on each.

In his original affidavit of November 9, 1981, McCormick stated:

> No other application is known to have been made to any judge for authorization to intercept wire communications making Angelo Ruggiero, John Gotti, Eugene Gotti, and Jackie Cavallo. Frank Guidici was a principal in an Order to Intercept Oral Communications, EDNY 190, signed by U.S. District Court Judge Mark A. Costantino on May 28, 1975.

The subsequent affidavits also stated that no other applications were "known to have been made" to any court for authorization to intercept wire or oral communications of the named interceptees.

At the time that McCormick swore to these affidavits denying knowledge of applications for authorization to intercept any

of the same persons, he was aware of previous electronic surveillance of the Bergen Hunt & Fish Club by the Queens County District Attorney's office. He learned of a wiretap at the Bergen Hunt & Fish Club on June 30, 1981, when the FBI and the New York Police Department, Manhattan South Morals Division, conducted a raid at the Bergen Hunt & Fish Club to seize illegal fireworks. McCormick was about to use the club's telephone to call his supervisor when Jackie Cavallo, one of the members of the club, told him it was bugged by Santucci, the Queens District Attorney. McCormick used the phone anyway. Later that day or the next, his supervisor, Mouw, told him that someone in Santucci's office had called him within ten minutes of McCormick's call to congratulate him on the raid. On cross-examination, McCormick conceded that he had had no doubt that a wiretap existed at that time. Throughout the summer of 1981, McCormick personally conducted surveillance of the Bergen Hunt & Fish Club. He knew that John Gotti, the capo of one of the Gambino crews, was running a gambling operation out of the club. John Gotti was there daily, as was Ruggiero, a subleader of the crew, and Guidici, who was in charge of gambling.

On September 3, Mouw and his two immediate supervisors met with the Queens District Attorney John Santucci and members of his staff. According to Mouw's minutes, the subject of the meeting was "Bergen Hunt and Fish Club." The purpose of the meeting "was to discuss the conflict of interest between the FBI and Queens DA's Office regarding the electronic surveillance efforts of John Gotti and his associates." The FBI was told that the Queens District Attorney had a microphone in the Bergen Hunt & Fish Club, as well as taps on the two telephones. The wiretaps were "very successful" on obtaining gambling information, but not other criminal activity such as homicides and loan sharking. Santucci commented that "wires at social clubs are definitely not productive, and instead efforts should be concentrated at their residences." In addition, the District Attorney's office "agreed to back off

from the Bergen and Our Friends Clubs in light of the FBI's investigative direction in this area." Mouw also testified that the meeting had a competitive air.

A second meeting was held on September 13 between Mouw and members of Santucci's staff. Mouw's memo states that the "purpose of the meeting was to coordinate the investigative efforts regarding the activities of John Gotti and his associates." Mouw testified that at the meeting it became apparent that the District Attorney's office was most concerned with a possible leak in their office and with enlisting the FBI's aid in discovering it. The District Attorney's office also told the FBI that as a result of the wiretap at the Bergen Hunt and Fish Club, they could execute 15 to 20 felony gambling arrests, but they were "reluctant to do so at this time because they want to proceed into the case in greater detail in hopes of further implicating the Gotti's in serious criminal matters." The FBI was also told of a mistake in the District Attorney's subpoena of telephone toll records for three subjects, including Michael Roccoforte and Ruggiero. Because the District Attorney's office failed to insert a "do not notify" proviso in the subpoena, the subjects were notified by the telephone company. A further meeting with McCormick present was proposed but Mouw testified that the meeting was never scheduled because the FBI feared the possible leak in the District Attorney's office and because the District Attorney's office had not been enthusiastic about working with the FBI. No other meetings between the two agencies were held in 1981 or 1982.

Although McCormick was not present at those meetings, Mouw discussed with him immediately afterwards the substance of the conversations and sent him the minutes of the meetings.

By virtue of the FBI tap on Ruggiero's phone, McCormick learned around January or February of 1982 that several members of the Bergen crew were getting inventory notices informing them that they had been intercepted by electronic surveillance. He testified that he does not now recall whether Ruggiero and John Gotti got notices.

He also learned by the FBI wire in January, 1982 that several of the Gambino crew were arrested on Mott Street because of the Queens District Attorney wiretap.

**Conclusions**

█ The provision of Title III at issue here is 18 U.S.C. § 2518(1)(e), which requires that an application for an order authorizing the interception of a wire or oral communication must include:

a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application....

The statute did not require McCormick to report that the subjects of his proposed surveillance had been previously intercepted during the course of prior surveillance; on the contrary, McCormick was only required to report if, to his knowledge, the subjects of the FBI application had been named as interceptees in the prior applications for surveillance. *See United States v. Easterling,* 554 F.2d 195, 196 (5th Cir. 1977) (per curiam); *United States v. Sklaroff,* 552 F.2d 1156, 1160 (5th Cir.1977), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978); *United States v. Florea,* 541 F.2d 568, 576 (6th Cir.1976), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977). The express language of the statute supports that conclusion, requiring a statement of facts concerning previous "applications." *See United States v. Bellosi,* 501 F.2d 833, 839 (D.C. Cir.1974). Furthermore, it would present an undue burden on the government to require it to disclose all previous interceptions, *see id.* at 839 n. 13, or even to disclose a prior application submitted with an affidavit discussing the proposed interceptee. *See Sklaroff, supra,* 552 F.2d at 1160.

McCormick never spoke directly to members of the Queens District Attorney's office and was never told explicitly by Mouw, who communicated directly with that office, that Ruggiero, John Gotti, and Guidici were named interceptees in the Queens District Attorney's electronic surveillance orders. Further, Mouw denied having such knowledge. McCormick never saw the Queens District Attorney's applications or the order authorizing electronic surveillance at the Bergen Hunt & Fish Club. When McCormick stated in his affidavits that no other application naming these three interceptees is "known to have been made," he meant that he had no direct knowledge that these persons were in fact named interceptees.

In fact, the converse is definitely false: McCormick could not have truthfully stated that he knew that applications had been made naming Ruggiero, John Gotti and Guidici as interceptees. Taken as a statement that McCormick was not certain that applications naming these persons had been made, the statement is literally true. Therefore, McCormick did not perjure himself when he swore to the affidavit. Neither did he intentionally circumvent the language of the statute or intentionally lead the United States District Court Judge to believe that there were no prior applications for the same persons. *Cf. United States v. Bellosi,* 501 F.2d 833, 835 (D.C. Cir.1974) (Government's intentional omission of a statement denying previous applications for the same persons, which would have been false, was a deliberate violation of the District of Columbia analog to § 2518(1)(e) calling for suppression).

Nevertheless, McCormick did not comply with the requirements of Title III when he made this statement in his affidavits. He has testified that he was fully aware of the Queens District Attorney's electronic eavesdropping at the Bergen Hunt & Fish Club in June, 1981. He also knew that John Gotti's headquarters were at the Bergen Hunt & Fish Club, and that John Gotti, Ruggiero, and Guidici were there on a daily basis throughout the summer. Furthermore, in September, 1981, Mouw briefed him on meetings Mouw attended with members of the Queens D.A.'s office, in which they discussed electronic surveillance ef-

forts on "John Gotti and his associates" and coordinated investigative efforts regarding the activities of "John Gotti and his associates." In the September 3 meeting, a microphone at the Bergen Hunt & Fish Club was explicitly discussed. McCormick conceded on cross-examination that the Bergen Hunt & Fish Club would be a good place to intercept John Gotti, that he had no reason to believe that John Gotti would not be intercepted there, and that he would "hope" that the Queens District Attorney's purpose in bugging the Bergen Hunt & Fish Club would be to intercept John Gotti. In practical terms, McCormick had every reason to believe that John Gotti, and probably Ruggiero and Guidici as well, were named interceptees of the state wire.

■ The statute does not impose upon government agents a duty to conduct a full investigation to ascertain the particulars of a prior state application, *see United States v. Harvey*, 560 F.Supp. 1040, 1073 (S.D.Fla. 1982), *aff'd sub nom. United States v. Van Horn*, 789 F.2d 1492 (11th Cir.1986), or even in these circumstances to impose upon an agent a duty to call the state office to find out who the named interceptees were. Further, McCormick had a legitimate fear of a possible security leak in the Queens office. Both McCormick and Mouw testified that they did not believe they could have called the District Attorney's office to find out the names of the principals of the state wire without disclosing their own investigation.

■ Nevertheless, McCormick failed in his duty of candor to the court. The language of § 2518(1)(e), requiring a "full and complete statement of the facts concerning all previous applications known to the individual ...," clearly envisions full disclosure of facts within the affiant's knowledge. He must make every effort to comply with that mandate, rather than read the provision narrowly. Although McCormick did not "know" in fact of prior applications naming these persons, he should have stated to the court the obvious inference and probability that some of the named interceptees had been named in prior applications. If he could not then make

a "full and complete statement of the facts," he could have explained why. Instead, he led the judge to believe that no other applications for any of these persons had been made, when McCormick believed otherwise. Under these circumstances, McCormick failed to comply with § 2518(1)(e).

■ Not every violation of § 2518(1)(e), however, mandates suppression under § 2518(10)(a)(i) on the grounds that the interception of the communication is "unlawful." *See United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). "To the contrary, suppression is required only for a failure to satisfy any of those statutory requirements that directly and substantially implement the Congressional intent to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Donovan*, 429 U.S. 413, 433–34, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977) (quoting *United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974)).

Courts have indicated that an intentional failure to comply with Title III requirements may mandate suppression. *See United States v. Harrigan*, 557 F.2d 879, 884–85 (1st Cir.1977) ("The unseemliness of government officials deliberately disobeying the law [by consciously deciding to prevent individuals from receiving the post interception notice required by § 2518(8)(d) ] is obvious."); *see also United States v. Donovan, supra*, 429 U.S. at 436 n. 23, 97 S.Ct. at 672 n. 23 ("There is no indication in this case that the Government agents knowingly failed to identify respondents ... for the purpose of keeping relevant information from the District Court that might have prompted the court to conclude that probable cause was lacking. If such a showing had been made, we would have a different case."). One court, acknowledging that no courts have yet addressed the issue, has suggested that even a reckless failure to comply with Title III should mandate suppression. *See United*

*States v. Sullivan,* 586 F.Supp. 1314, 1323 (D.Mass.1984).

With respect to the first category of cases in which suppression is required, the Supreme Court has defined the inquiry as whether the addition of the omitted information would have led the issuing judge to decide that the statutory preconditions to authorization were not satisfied. *See Donovan, supra,* 429 U.S. at 436, 97 S.Ct. at 672. The statutes provide for authorization where the issuing judge

> determines that normal investigative techniques have failed or are unlikely to succeed and there is probable cause to believe that: (i) an individual is engaged in criminal activity; (ii) particular communications concerning the offense will be obtained through interception, and (iii) the target facilities are being used in connection with the specified criminal activity. §§ 2518(3)(a–d).

*Donovan, supra,* 429 U.S. at 435, 97 S.Ct. at 672. Thus, suppression is mandated if, with the additional information, the issuing judge would not have found the requisite elements of necessity and probable cause.[1]

Several courts have held unqualifiedly that disclosure of prior wiretaps under § 2518(1)(e) does not relate to the determinations of probable cause and necessity the judge must make, and therefore that inadvertent failure to disclose does not require suppression of the interceptions. *See United States v. Van Horn,* 789 F.2d 1492, 1500 (11th Cir.1986); *United States v. Orozco,* 630 F.Supp. 1418, 1518 (S.D.Cal.1986); *United States v. Gambale,* 610 F.Supp. 1515, 1537 (D.Mass.1985); *cf. United*

*States v. Abramson,* 553 F.2d 1164, 1170 (8th Cir.) (failure to disclose the fact of suppression of a prior wiretap "did not detract from the sufficiency of the enumerated factors"), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977). It is true that the mere existence of a prior wiretap could not detract from a showing of probable cause. This court cannot agree, however, that no prior wiretap could affect the issuing judge's determination of necessity. Nevertheless, in this case it is beyond doubt that the issuing judges would have authorized the electronic surveillance, even with knowledge of the prior wiretap.

The strongest argument against granting an application for electronic surveillance of Ruggiero's home is that government agents could have gotten the information they sought by use of the wire at the Bergen Hunt & Fish Club. To McCormick's knowledge, however, the state wire had only limited success, and would have been clearly inadequate to the FBI investigation. Even assuming that the FBI had access to the results of the state wire, it was not beneficial outside the area of gambling. As set forth in McCormick's initial affidavit of November 9, 1981, the FBI had probable cause to believe that it could obtain information on making and collecting credit by extortionate means as well as information on gambling. McCormick's affidavit of April 5, 1982, added information on conspiracy to distribute heroin and cocaine, and his affidavit of May 7, 1982 added information on obstruction of justice and conspiracy to murder. The Queens District Attorney believed as a result of

---

**1.** The *Donovan* Court noted that nothing in the legislative history suggests that the identification requirement in § 2518(1)(b) was intended to play a central or functional role in guarding against unwarranted use of wiretapping. In a case prior to *Donovan,* Court of Appeals for the District of Columbia Circuit found a similar lack of evidence in the legislative history of § 2518(1)(e). *See United States v. Bellosi,* 501 F.2d 833, 839 (D.C.Cir.1974). Nevertheless, it considered the various purposes that Congress could have intended the requirement to serve, and held that failure to comply with § 2518(1)(e) requires suppression. *Id.* at 838–40. This court concludes, however, that *Bellosi* has been implicitly overruled by *Donovan.* If

failure to name a person in a wiretap application does not require suppression, as *Donovan* holds, the failure to disclose prior applications in which that person was a named interceptee should not require suppression. *See United States v. Sullivan,* 586 F.Supp. 1314, 1323 (D.Mass.1984). The *Bellosi* Court's concern with excessive intrusion on the targets' privacy is implicitly minimized by the Supreme Court in *Donovan,* for if the issuing judge is not apprised of the names of all targets in the present application, it is impossible for him to inquire into "overbugging" for the omitted targets. In *Donovan,* any inquiry of "central role" is collapsed into the determinations of necessity and probable cause.

their interceptions that "wires at social clubs are definitely not productive," and that "efforts should be concentrated at [the targets'] residences" instead.

■ Furthermore, even if McCormick could surmise that the state wire had produced information sufficient to bring charges against some of the Gambino crew, he had no reason to believe that all of the persons named in his initial and subsequent applications were implicated by the state interceptions. "Electronic surveillance may be permissibly employed against certain members of a criminal organization even though concrete evidence against other members has already been gathered." *United States v. Orozco*, 630 F.Supp. 1413, 1511 (S.D.Cal.1986) (citing *United States v. Bailey*, 607 F.2d 237, 242 (9th Cir.1979); *United States v. Newman*, 733 F.2d 1395, 1399 (10th Cir.1984); *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir.), *cert. denied*, 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981)).

■ Based on its own investigation, the FBI had substantial reason to believe that Ruggiero discussed shylocking and gambling matters over his home phone with the other named interceptees. The factual basis for this conclusion is set forth in McCormick's affidavits. Furthermore, the members of the Bergen Hunt & Fish Club seem to have been aware, at least as of June 30, 1981, that the phones were being tapped. The failure of normal investigative means, as well as the earlier state wiretaps, clearly indicated the "necessity" of the electronic surveillance of a residence. Although the issuing judges may have been concerned with excessive intrusion on the targets' privacy, *see United States v. Bellosi, supra*, 501 F.2d at 841, there was sufficient evidence to establish that such intrusion was necessary to obtain information on crimes other than gambling. Therefore, the failure to comply with § 2518(1)(e) does not require suppression.

Although the courts that have considered the issue agree that deliberate noncompliance requires suppression, McCormick read the requirement of disclosure of prior applications to mean applications in which he in fact knew the targets of his application were named interceptees. He did not possess such direct knowledge, whatever logic and reason might have dictated. Therefore, the tapes will not be suppressed on that ground.

■ Although this technical reading of the statute is unreasonable given the statute's obvious concern with "full and complete" disclosure to the issuing judge, an unreasonable but inadvertent omission is not the "unlawful" noncompliance with which the statute is concerned. *See Van Horn, supra*, 789 F.2d at 1500. It is not necessary to address whether a "reckless" omission would be grounds for suppression, since, even though McCormick must have assumed that John Gotti was a named interceptee of the state wire, he did not by concealing that assumption show a reckless disregard for the requirements of § 2518(1)(e).

Finally, there is no constitutional ground for suppression under the present circumstances. Under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), if information contained in an affidavit is intentionally false or the product of reckless disregard for the truth, the remedy under the Fourth Amendment is to set aside the affidavit's false material. Here, as discussed above, there can be no doubt that even if the issuing judges had been advised of the prior New York State electronic surveillance, they would have granted the applications for the Title III orders.

Therefore, the motion to suppress is denied.

IT IS SO ORDERED.