789 F.2d 1492
 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
 UNITED STATES of America, Plaintiff-Appellee,
v.
Marion VAN HORN, Scott Bertelsen, Gary Balough, Dennis Kay,
Robert Van Horn, Dennis Cason, Thomas Sikes, John
Crosby Bertelsen, Joseph William
Campbell, Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
William Joseph HARVEY, a/k/a Billy, Defendant-Appellant.
 Nos. 83-5102, 84-5138.
 United States Court of Appeals,
Eleventh Circuit.
 May 23, 1986.
As Amended on Denial of Rehearing and Rehearing En Banc July 25, 1986.
 
 Richard Harris, Neil Karadbil, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee in 83-5102.
 Paul D. Lazarus, Nurik, O'Donnell & Lazarus, Lauderdale, Fla., for Scott Bertelsen.
 David Goodhart, Goodhart & Rosner, Paul M. Rashkind, Miami, Fla., for Thomas Sikes.
 Paul M. Rashkind, Miami, Fla., for J.C. Bertelsen.
 Ronald A. Dion, Entin, Schwartz, Dion & Sclafani, North Miami Beach, Fla., for M. Van Horn, R. Van Horn, Dennis Kay, Dennis Cason, Gary Balough, Scott Bertelsen & Joseph William Campbell.
 James J. Hogan, Miami, Fla., George Robert Blakey, Notre Dame Law School, Notre Dame, Ind., for defendants-appellants.
 Neil Karadbil, Ft. Lauderdale, Fla., Jon May, Linda Collins Hertz, Richard Kamp, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee in 84-5138.
 Appeals from the United States District Court for the Southern District of Florida.
 Before FAY and KRAVITCH, Circuit Judges, and HENLEY*, Senior Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 Ten different defendants challenge their convictions under various charges stemming from a marijuana importation and distribution ring.[1] The ring, masterminded by appellant William Joseph Harvey, operated between 1978 and 1982. Harvey ran the operation from his office at the Delray Towing Service, a business he owned in Delray Beach, Florida. The organization used speedboats to transport marijuana from large freighters into the United States, and then distributed the marijuana.
 
 
 2
 There is no contention that the evidence was not sufficient to show the participation of all of the appellants in the conspiracy. The prosecution, however, relied on evidence obtained by electronic surveillance of Harvey's office at Delray Towing. All of the appellants challenge the legality of the surveillance and contend that the evidence should not have been admitted. The district court conducted an evidentiary hearing and, after long and careful consideration, denied the appellants' motion to suppress the evidence. United States v. Harvey, 560 F.Supp. 1040 (S.D.Fla.1982). The propriety of this decision is the main focus of this appeal.
 
 
 3
 I. ADMISSIBILITY OF THE ORAL INTERCEPT EVIDENCE
 
 Background
 
 4
 On October 17, 1980, the government applied to the district court for an order authorizing interception of oral communications in Harvey's office at Delray Towing. The application was supported by an affidavit of Stephen Gillman, an Assistant United States Attorney, and Harold C. Copus, an agent of the Federal Bureau of Investigation (FBI). On October 20, the district court entered an order authorizing interception for thirty days; the district court entered orders extending the interception period on November 20 and again on December 19. The listening device functioned from October 24, 1980 until January 19, 1981.
 
 
 5
 The district court's authority to authorize the electronic surveillance involved in this case is found in Title III of The Omnibus Crime Control and Safe Streets Act of 1968. 18 U.S.C. Secs. 2510-2520. Title III sets forth numerous requirements the government must meet before surveillance may be authorized, 18 U.S.C. Sec. 2518(1), the findings the district court must make, 18 U.S.C. Sec. 2518(3), and requirements for the district court's authorization order. 18 U.S.C. Sec. 2518(4). Title III contains its own exclusionary rule under which the appellants all have standing to challenge the surveillance. 18 U.S.C. Sec. 2518(10). The appellants raise numerous potential deficiencies in the district court's authorization.
 
 
 6
 A. Necessity of Electronic Surveillance Under 18 U.S.C. Sec. 2518(1)(c).
 
 
 7
 An application for interception must contain
 
 
 8
 a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.
 
 
 9
 18 U.S.C. Sec. 2518(1)(c). Appellants contend that the two affidavits supporting the government's October 17, 1980, application are little more than "boilerplate." They argue that alternative investigative techniques were available, namely, ordinary surveillance, execution of a search warrant of Delray Towing, an undercover "sting" operation, and a grand jury investigation with immunity for witnesses.
 
 
 10
 The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed. United States v. Giordano, 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974); United States v. Kahn, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves. United States v. Alonso, 740 F.2d 862, 868 (11th Cir.1984), cert. denied, --- U.S. ---- 105 S.Ct. 928, 83 L.Ed.2d 939 (1985); United States v. Hyde, 574 F.2d 856, 867 (5th Cir.1978). Judged by these standards, we believe the affidavit in this case was sufficient.
 
 
 11
 With respect to the utility of ordinary surveillance techniques, Agent Copus' affidavit sets forth numerous facts showing that they had been attempted and had failed. The affidavit also explains the failures. The affidavit states that surveillance of actual marijuana off-load operations was impossible because of anti-surveillance techniques employed by Harvey. These techniques included use of a helicopter, night scopes and listening devices, and central command of the various small vessels from a larger vessel. In addition, it is obvious that the government was not seeking to catch one or two small vessels with marijuana, but to expose the entire conspiracy. The affidavit also sets forth the reasons why surveillance of the headquarters at Delray Towing was impossible. According to the affidavit, to the west of Delray Towing was the city dump; to the east a parking lot for a night club that was frequented by members of the ring and owned by Harvey's father; to the north a garage, to which agents could not obtain access without disclosing the investigation; to the south, the nearest point from which surveillance could be conducted was a half mile away. Harvey also conducted security procedures at Delray Towing; indeed, one attempt at surveillance from a building approximately one-half to one mile away was discovered by Harvey. Finally, the affidavit states that even if ordinary surveillance were practical, it could only lead to evidence that members of the conspiracy were meeting, and not to direct evidence of criminal activity.
 
 
 12
 The affidavit explained that a search of the premises at Delray had been considered and rejected because it was not believed that there was sufficient physical evidence there to reveal the entire conspiracy or to successfully prosecute its members.
 
 
 13
 With respect to a "sting" operation, the affidavit indicates that the informants upon which the government was relying feared for their lives because of threats from Harvey. The affidavit also states that government agents had tried and failed to gain introduction to Harvey. The affidavit asserts that such attempts would endanger the lives of undercover agents and informants. Appellants contend that the affidavit is incredible in this respect because the FBI had informants with knowledge of the conspiracy. The contention is frivolous: that the informants may have known of the conspiracy does not mean Harvey would have trusted them. Moreover, the affidavit explained that these persons feared for their lives.
 
 
 14
 Agent Copus' affidavit further states that he had discussed the possibility of a grand jury investigation with the Assistant United States Attorney. The affidavit explains that such an investigation was rejected because the necessary witnesses were members of the conspiracy and would not voluntarily testify, and that it had been impossible to determine the roles of various members of the conspiracy in order to judge who should be afforded immunity.
 
 
 15
 With respect to the danger to informants posed by either a sting operation or a grand jury investigation, we note that the affidavit asserts that one informant directly refused to testify out of fear, another source relayed death threats that Harvey had made against potential informants, another witness had been beaten and received death threats, one member of the conspiracy was left at a hospital with bullet wounds which he refused to explain and another person was threatened with death. The affidavit therefore presents a pattern of threats and a presence of danger to witnesses and agents. This existence of danger is one of the justifications for electronic surveillance. 18 U.S.C. Sec. 2518(1)(c). The appellants argue that the fears alleged in the affidavit are belied by the fact that witnesses testified at trial. Again, this contention is frivolous; that witnesses were willing to testify in court after the FBI had broken the conspiracy and arrested its members does not indicate that they would have been willing to do so at the time the surveillance was requested.
 
 
 16
 Appellants' final contention with respect to necessity is that the district court improperly relied on Agent Copus as an expert witness. This contention is difficult to understand. The district court's authorization order does not state that its decision was based on any expert opinion of Agent Copus, and as discussed above, the affidavit set forth numerous factual matters rather than expert opinion. The appellants cite no authority that an application for oral interception must be based on an expert opinion. In any event, the affidavit indicates that Agent Copus had five years experience as an FBI agent, with two years of specialization in narcotics; the district court clearly would have been within its discretion had it chosen to rely on Copus as an expert.
 
 
 17
 B. Probable Cause under 18 U.S.C. Sec. 2518(1)(b).
 
 An application must include
 
 18
 a full and complete statement of the facts and circumstances ... including (i) details as to the particular offense that has been, is being, or is about to be committed.
 
 
 19
 18 U.S.C. Sec. 2518(1)(b)(i). The offense set forth in the application was a RICO conspiracy. 18 U.S.C. Secs. 1961-68. The affidavit lists an organization with a leader, various lieutenants, and workers. The organization was headquartered at Delray Towing, and had a continuing business of importing and distributing marijuana. The appellants' contentions that the affidavit did not establish probable cause that there had been an agreement to commit two predicate RICO acts, 18 U.S.C. Sec. 1961(5), and that the affidavit did not set forth probable cause that there was a RICO enterprise, 18 U.S.C. Sec. 1961(4), require no further discussion in light of the facts already discussed. See United States v. Bascaro, 742 F.2d 1335, 1342-43 (11th Cir.1984) (marijuana offenses may be predicate acts for RICO charge), cert. denied, --- U.S. ----, 105 S.Ct. 3476, 3477, 3488, 87 L.Ed.2d 613 (1985); United States v. Pepe, 747 F.2d 632, 659-60 (11th Cir.1984) (RICO conspiracy requires that defendant agree to commit the two predicate acts and be aware that others have done so); United States v. Hewes, 729 F.2d 1302, 1310-11 (11th Cir.1984) (definition of RICO enterprise), cert. denied, --- U.S. ----, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). In addition, the affidavit demonstrated an ongoing enterprise operated out of Harvey's office; thus there was probable cause to believe that the surveillance would yield incriminating evidence.[2]
 
 
 20
 The appellants urge that even if probable cause existed at the time of the application, the district court should have terminated the surveillance when no incriminating conversations were intercepted during the first days of the wiretap. The appellants argue that the district court should have shut down the surveillance upon receipt of the reports indicating no progress in the investigation. They cite two reasons why probable cause no longer existed: at the time of the November 12, 1980, progress report, no relevant conversations had been obtained and the latest information on Harvey was sixty-six days old; and after the surveillance began the agents learned that Harvey was out of town.
 
 
 21
 In our view a district court is not required to terminate a surveillance whenever it receives a report of no progress. First, the progress reports the district court required in this case were not mandated by the statute, but were ordered at the discretion of the district judge. 18 U.S.C. Sec. 2518(6). Accordingly, the import of the progress reports was also a matter within the discretion of the authorizing district court. See United States v. Iannelli, 477 F.2d 999, 1002 (3d Cir.1973), aff'd on other grounds, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). In authorizing the thirty days of surveillance, the district court determined that there was probable cause to believe relevant communications would be intercepted within the thirty day period. 18 U.S.C. Sec. 2518(3)(b). The proper time to consider whether the information in the affidavit had become stale would be at the end of the thirty days when the government reapplied. 18 U.S.C. Sec. 2518(1)(f). The district court was clearly within its discretion in determining that the information in the affidavit justified thirty days of surveillance. The affidavit set forth a continuing criminal enterprise, operating over a long period of time. See Scott v. United States, 436 U.S. 128, 140-42, 98 S.Ct. 1717, 1724-26, 56 L.Ed.2d 168 (1978) (investigations of large, complex conspiracies justify a greater scope of surveillance); United States v. Bascaro, 742 F.2d 1335, 1345-46 (11th Cir.1984) (staleness of evidence considered liberally in cases involving large drug conspiracies due to their protracted and continuous nature), cert. denied, --- U.S. ----, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). Accordingly, the fact that the most recent information would have been two months old at the end of the period does not indicate that probable cause did not exist.
 
 
 22
 Furthermore, Harvey's temporary absence, reported to the district court, did not negate the probable cause. First, the FBI stated in its progress reports that it believed Harvey would return shortly.[3] Second, the affidavit set forth three other employees of Delray Towing as possible conspirators, and these persons could have been overheard in the office even during Harvey's absence.[4]
 
 
 23
 C. Showing of Previous Applications for Electronic Surveillance Under 18 U.S.C. Sec. 2518(1)(e).
 
 
 24
 The application for electronic surveillance must include
 
 
 25
 a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities, or places specified in the application, and the action taken by the judge on each such application.
 
 
 26
 18 U.S.C. Sec. 2518(1)(e). Prior to the federal surveillance, the Boca Raton, Florida Police Department had obtained authorization for a state Title III wiretap on the phone of Robert Jernigan, one of the members of the drug ring. The federal agents learned of the state wiretap on October 14, 1980. Harvey was one of the named targets of the state wiretap. The state wiretap was not disclosed in the October 17, 1980 application for surveillance. In considering the motion to suppress, the district court found that the government had intended to disclose the wiretap, but that a page of the application, (page 21C) had been inadvertently omitted. 560 F.Supp. at 1070. The district court also found that the FBI agents did not know at the time that Harvey was a target of the state investigation.
 
 
 27
 The appellants argue that, even including page 21C, the application did not contain "a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application." They argue that the agents knew that Harvey was a named target of the state Title III. The district court, after a hearing on the motion to suppress, found otherwise, 560 F.Supp. at 1073, and appellants must show these findings to be clearly erroneous. Appellants focus on testimony of government agents that they knew about the state wiretap, and that they knew that Harvey had been intercepted. That Harvey might have been intercepted is an obvious inference from the existence of the wiretap, as the application set forth a believed criminal relationship between Harvey and Jernigan. The agents, however, clearly testified that they did not know Harvey had been named on the state application, and the district court chose to believe this testimony. The agents further testified that they did not learn whether Harvey had actually been intercepted. The district court also relied on testimony that the FBI agents did not attempt to learn the details of the state investigation because they feared tainting their own evidence if the state investigators had committed any illegalities, found the state investigators uncooperative, and thought the state investigators were after Jernigan rather than Harvey. We hold that the district court's finding that the FBI did not know that Harvey was a named target of the state Title III is not clearly erroneous. Accordingly, had page 21C been included, the application would have met the disclosure requirement.[5]
 
 
 28
 We must consider, therefore, what standard applies to an inadvertent omission of material required by section 2518(1)(e). Title III's exclusionary rule applies to communications that have been "unlawfully intercepted." 18 U.S.C. Sec. 2518(10)(a). The Supreme Court has ruled that not all failures to satisfy the statutory requirements of Title III render an interception "unlawful." United States v. Donovan, 429 U.S. 413, 438, 97 S.Ct. 658, 673, 50 L.Ed.2d 652 (1977). In Donovan, the Court held that a violation of the requirement that the application identify all those likely to be overheard, 18 U.S.C. Sec. 2518(1)(b)(iv), did not mandate suppression because the requirement did not play a central role in the decision to authorize surveillance. The Supreme Court found a difference between those requirements of the application that pertain to the determination the district judge must make to authorize the surveillance (section 2518(3)(a-d)) and the remaining requirements for the application. The determinations the authorizing judge must make relate to the probable cause and necessity requirements. The disclosure of prior wiretaps does not relate to the legal determination the judge must make. Accordingly, inadvertent noncompliance with the section 2518(1)(e) disclosure requirement does not mandate suppression. Our conclusion is consistent with the only other circuit we know to have considered the question since the Supreme Court's decision in Donovan. See United States v. Abramson, 553 F.2d 1164, 1169-70 (8th Cir.), cert. denied, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977).[6]
 
 
 29
 The appellants also claim that the omission of page 21C was a constitutional violation, requiring dismissal under Franks v. Delaware, 438 U.S. 154, 171-72, 98 S.Ct. 2674, 2684-85, 57 L.Ed.2d 667 (1978). Franks only applies, however, to intentional or reckless omissions from an affidavit. Id. Affidavits supporting warrants are presumed valid, and the party seeking suppression bears the burden of showing the omission was more than negligent. Id. at 171, 98 S.Ct. at 2684; United States v. Martin, 615 F.2d 318, 327-29 (5th Cir.1980). The district court found that the omission was inadvertent. The appellants contend that this finding is clearly erroneous, arguing that the omission itself raises an inference of recklessness, and that the government must then prove that the omission was not reckless. We disagree. There may be cases in which the district court may infer recklessness from an omission, but we do not believe it was required to do so in this case. See Franks, 438 U.S. at 171, 98 S.Ct. at 2684 (party seeking suppression must prove omission was more than negligence); Martin, 615 F.2d at 329. The record demonstrated that the government had intended to include page 21C, as the material was referred to in subsequent progress reports. A government agent filing an affidavit has a duty to ensure that the affidavit has been carefully assembled, but that does not mean that if a page slips out the agent has been reckless. Here, there is not even any evidence that the government agents failed to proofread or otherwise properly examine the affidavit. We hold that the findings of the district court are not clearly erroneous. Accordingly, because the omission was not shown to be reckless, we need not address the implications of Franks for Title III cases.
 
 
 30
 D. Whether the Surveillance Was Properly Minimized as Required by 18 U.S.C. Sec. 2518(5).
 
 
 31
 Every authorizing order must require that the surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. Sec. 2518(5). The authorizing order at issue contained such a requirement. The district court found that the monitoring agents had made a good faith effort to minimize, and that they had in fact reasonably minimized interception. 560 F.Supp. at 1075-76.
 
 
 32
 The appellants contend that the agents did not minimize. They do not rely on evidence that nonpertinent conversations were monitored; rather they rely upon the practices the agents used and the supervision of the district court. They note that the agents violated their own guidelines for minimization. The practices appellants criticize are as follows. The application stated that the agents would minimize by suspending monitoring whenever voice identification indicated that the conversants were not the principals, and that agents would coordinate their monitoring with surveillance of Delray Towing to ensure that some of the principals were inside when monitoring was done. The agents found voice identification difficult during the early stages of the monitoring, and did not coordinate their monitoring with normal surveillance. The Assistant United States Attorney instructed the agents to tape record all monitored conversations, but in fact the agents only recorded conversations they believed incriminating. They also monitored during times they knew Harvey was out of town.
 
 
 33
 The Supreme Court discussed the principles for reviewing claims that agents failed to minimize Title III surveillance in Scott v. United States, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). The Court first made clear that the motives, or good faith, of the monitoring agents was simply not an important consideration. 436 U.S. at 138-39, 98 S.Ct. at 1723-24. Rather, the question is whether the agents' monitoring was reasonable in light of all the facts and circumstances of the case. The Court cited several factors in Scott, including the number of nonpertinent conversations intercepted, the location of the surveillance, and the nature of the investigation. Id. at 139-40, 98 S.Ct. at 1724-25.
 
 
 34
 In the current case, therefore, we place little weight on the fact that the agents deviated somewhat from the conditions in the application. Although the practices employed by the agents are a consideration, we are more concerned with whether the agents in fact monitored nonpertinent conversations. In any event, the practices employed were reasonable. With regard to the voice identification issue, we note that in the early stages the agents were dealing with what they believed to be a large conspiracy with many of the members still unidentified. Accordingly, they could hardly use voice identification alone to guide their monitoring. See Scott, 436 U.S. at 141, 98 S.Ct. at 1725 (voice identification may be impossible during initial stages of a conspiracy investigation). Indeed, one of the goals of the surveillance was to identify additional conspirators. As far as coordination with normal surveillance, we have already discussed the difficulties of such surveillance in this case. We have also already discussed the effect of Harvey's absence; there were other members of the conspiracy who may have been overheard in the office, and the agents expected Harvey to return. Scott, 436 U.S. at 140-41, 98 S.Ct. at 1724-25 (when bug is located in place frequented by conspirators rather than public, wider monitoring is justifiable).
 
 
 35
 The appellants also urge that the authorizing district judge's failure to terminate the surveillance upon receipt of reports of no progress indicates the surveillance was not minimized. Again appellants miss the mark. The progress reports reveal no pertinent conversations, but do not show that the agents were unduly monitoring nonpertinent conversations.
 
 
 36
 We turn to the key issue, whether in fact the agents unreasonably monitored nonpertinent conversations. The district court found, on the basis of the agents' testimony and their monitoring logs, that the agents ceased monitoring conversations they determined to be nonpertinent. The logs and testimony do in fact support the district court's conclusion. Most important, the appellants have produced no evidence of specific conversations which the agents should not have monitored. Because the appellants cite no evidence contradictory to the district court's findings of fact, we must accept them as not clearly erroneous. We therefore hold the agents complied with the minimization requirements.
 
 
 37
 E. Validity of the November 20 order Extending the Authorization for Another 30 Days.
 
 
 38
 Appellants claim that the extension of surveillance was without probable cause, again focusing on whether the elements of a RICO conspiracy were shown. The contentions have been adequately discussed above. We note, however, that the probable cause was boosted by the interception of pertinent conversations on November 18 and 19, tending to confirm the existence of the conspiracy.
 
 
 39
 Appellants also challenge the extension on the ground that the authorizing judge was outside the district when he executed the order. The authorizing judge, a judge of the Southern District of Florida, was in the Middle District of Florida at the time. As a judge of the Southern District, the judge had the power to authorize surveillance conducted within that district. 18 U.S.C. Sec. 2518(3). Appellants cite no authority for their contention that district courts may not authorize surveillance conducted within their territorial jurisdiction if the judge happens to be physically outside the jurisdiction. Nor is there any reason to deny district judges such power. Indeed, such authority has traditionally been recognized. See, e.g., United States v. Strother, 578 F.2d 397 (D.C.Cir.1978).
 
 
 40
 Appellants also urge that the government's application for the November 20 extension was tainted because it referred to the state wiretap, arguing that the state wiretap was invalid because Florida law does not permit wiretapping for investigation of marijuana offenses.
 
 
 41
 Florida law authorizes surveillance for marijuana offenses; hence we reject appellants' contention that the state wiretap was invalid. Appellants' argument is based on a difference between the language of the state and federal wiretapping statutes. The federal statute authorizes investigations of "dealing in narcotic drugs, marijuana or other dangerous drugs." 18 U.S.C. Sec. 2516(2). The state law, however, refers only to "narcotics or other dangerous drugs." Fla.Stat.Ann. Sec. 934.07. According to appellants the state omitted "marijuana" in order to exclude marijuana offenses from electronic surveillance. Appellants cite nothing in either the legislative history or Florida decisions to support this contention. In fact the state likely omitted "marijuana" because it believed it redundant in light of the inclusion of "dangerous drugs." The Florida courts have not directly addressed the issue, but they have referred to marijuana as a dangerous drug, and have affirmed convictions for marijuana offenses on the basis of wiretap evidence. See, e.g., State v. Manning, 379 So.2d 1307 (Fla.Dist.Ct.App.1980) (affirming use of electronic surveillance evidence in marijuana case); Hamilton v. State, 366 So.2d 8 (Fla.1978) (marijuana a dangerous drug). Accordingly, we hold that the state electronic surveillance law includes marijuana offenses and the state wiretap therefore was valid.F. Compliance with Disclosure Requirement of 18 U.S.C. Sec. 2517(5) with respect to the Federal Surveillance
 
 
 42
 The application and authorization orders for the surveillance in this case designated, among others, the following sections: 21 U.S.C. Secs. 841(a), 846, and 18 U.S.C. Sec. 1962(c-d). Appellant Harvey was indicted under 21 U.S.C. Sec. 848, 952(a) & 963. Harvey contends that the variance between the application and the indictment invoked the requirement of section 2517(5) that the government obtain prior approval before disclosing the evidence. Section 2517(5) provides:
 
 
 43
 When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.
 
 
 44
 Harvey urges that the charges in the indictment were for "offenses other than those specified in the order of authorization or approval," and that the government revealed evidence to the grand jury without obtaining judicial approval.
 
 
 45
 The government responds that (1) the application set forth probable cause of the existence of the violations charged in the indictment and that the mere failure to include statutory citations does not mean that the offenses were "other than those specified," and (2) that the use of the evidence was in effect approved by the authorizing court, which viewed progress reports and extended the surveillance.
 
 
 46
 Congress adopted section 2517(5) because it "wished to assure that the Government does not secure a wiretap authorization order to investigate one offense as a subterfuge to acquire evidence of a different offense for which the prerequisites to an authorization order are lacking." United States v. Campagnuolo, 556 F.2d 1209, 1214 (5th Cir.1977). In this case it is clear that no "subterfuge" occurred. The government uncovered the very conspiracy it identified in its original application, and the conspiracy was conducting the very activities listed; the government simply charged Harvey under a different statute than the one set forth in the application. The government argues with some force that requiring approval under section 2517(5) would simply elevate form over substance.
 
 
 47
 We hold, however, that regardless of whether the government was required to seek judicial approval, the continuing approval of the authorizing district court, after it had been apprised of the conversations intercepted, meets the judicial approval requirement.[7] The purpose of the judicial approval limitation is to prevent incidental interception of conversations for which the government has shown no probable cause; the statute does not ensure that a defendant is charged only with the crimes set forth in the application. In considering whether the judicial approval required by the statute has occurred, courts must keep in mind this purpose. Cf. United States v. Campagnuolo, 556 F.2d 1209, 1214 (5th Cir.1977). Courts thus have considered the section 2517(5) approval requirement flexibly, and have held that the court need not have approved of the new charges as long as it has approved of the collection of the evidence supporting those charges. See United States v. Masciarelli, 558 F.2d 1064, 1067-69 (2d Cir.1977) (section 2517(5) approval impliedly made by authorizing judge who extended surveillance after being told of evidence supporting charges not asserted in application); United States v. Tortorello, 480 F.2d 764, 782-83 (2d Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). Here, the authorizing judge received both progress reports and applications for extension, and these described the nature of the conversations being intercepted. The authorizing judge twice extended the surveillance. Accordingly, he reviewed the conversations which the government had been intercepting, and determined that they were properly intercepted. This suffices to meet section 2517(5) requirement.
 
 
 48
 G. Compliance with 18 U.S.C. Sec. 2517(5) with Respect to Use of Evidence from the State Wiretap
 
 
 49
 Appellants complain that the government used evidence obtained through the state wiretap without obtaining proper or timely approval as required by section 2517(5). The federal agents learned of the existence of a state wiretap on October 14, 1980. They did not obtain approval to use the evidence until August 1982. The approval was from the Florida circuit judge who had authorized the state surveillance. The appellants raise several arguments in support of their claim that the approval was improper and untimely; none of the arguments requires extensive discussion.
 
 
 50
 Appellants maintain that the application to use the state evidence was not properly approved because section 2516(1) requires approval from an attorney general or assistant attorney general. Section 2516(1) does not apply to an application to a state judge for approval; it applies only to applications submitted to a "Federal judge of competent jurisdiction." Such authorization does not allow further monitoring, but simply allows use of conversations already intercepted. We hold that no special approval is required before submission of section 2517(5) applications to state courts.
 
 
 51
 The appellants further claim that the state judge's authorization was invalid because there is no indication that he made the finding "that the contents were otherwise intercepted in accordance with the provisions of this chapter," required by section 2517(5). They note that the government's application made no effort to show that the communications were properly intercepted. We disagree. The state judge expressly found that the interceptions related to the federal charges were "intercepted incidentally." This was the same judge who had authorized the state wiretap, and accordingly he was in a position to know whether the state agents had properly executed the state wiretap. The finding that the conversations were intercepted incidentally makes complete sense as both the state and federal agents were investigating violations of marijuana laws. Appellants cite no evidence contrary to this finding.
 
 
 52
 Section 2517(5) requires that applications for approval be made "as soon as practicable." Appellants insist that the government learned of the state wiretap on October 14, 1980, and that it should not have waited until August 9, 1982, to obtain approval. We hold that the government's request was timely. In considering the timeliness issue, we must keep in mind the purpose of section 2517(5), to prevent subterfuge. United States v. Vento, 533 F.2d 838, 855 (3rd Cir.1976). We reiterate that the federal and state investigators were investigating precisely the same activity, and there is no hint that the state wiretap was a subterfuge to generate evidence for federal charges. Moreover, although the federal agents learned of the existence of the state wiretap in October 1980, they did not learn the contents until March 1982. Accordingly, the delay was only five months. Finally, the appellants have not shown any prejudice from the delay. Vento, 533 F.2d at 855; United States v. Southard, 700 F.2d 1, 30-31 (1st Cir.), cert. denied, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).[8]
 
 
 53
 According to the appellants, however, the agents used the information from the state wiretap to obtain the indictment against Harvey, and use of the evidence before obtaining the approval violated section 2517(5). The evidence cited by appellants is testimony by Darryl Falls, a witness who was implicated in the state evidence. Appellants argue that the testimony was the fruit of the state wiretap, and that therefore approval was required prior to use of the testimony. We disagree. Section 2517 enumerates three situations in which use or disclosure of intercepted communications is permissible. 18 U.S.C. Sec. 2517(1-3). By its terms, the requirement of approval for use of evidence set forth in section 2517(5) applies only to use of the evidence under section 2517(3). Section 2517(3) concerns disclosure of the communication or evidence derived from the communication while testifying under oath. The testimony of coconspirator Falls obviously came from personal knowledge rather than from the surveillance; he did not disclose any evidence obtained from the surveillance and his testimony was therefore not within section 2517(3). Nor did any other witness before the grand jury relay the contents of any conversations intercepted in the state wiretap or any other evidence discovered by the witness as a result of the state wiretap. Accordingly, section 2517(5) approval was not necessary before the grand jury proceeding.
 
 
 54
 Finally, the appellants challenge the authority of the state circuit judge to enter the approval order. Section 2517(5) requires approval by "a judge of competent jurisdiction." The statute includes the following within the definition of a judge of competent jurisdiction:
 
 
 55
 a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders authorizing interceptions of wire or oral communications
 
 
 56
 18 U.S.C. Sec. 2510(9)(b). The approving judge, a Florida circuit judge, is authorized to enter such orders under Fla.Stat.Ann. Sec. 934.02(8).
 
 
 57
 For the foregoing reasons, the order of the district court denying the motion to suppress is AFFIRMED.
 
 II. TRIAL ISSUES
 A. Severance
 
 58
 The appellants who went to trial all claim that they were entitled to a severance from the trial of Gainer Jernigan. Unlike the other defendants, Jernigan was charged with a continuing criminal enterprise violation under 21 U.S.C. Sec. 848. The appellants point out that in order to avoid conviction under 21 U.S.C. Sec. 848, counsel for Jernigan adopted a strategy of admitting involvement in a conspiracy, but denying that Jernigan played a key role. According to appellants this strategy prejudiced their defense.
 
 
 59
 Claims of severance are governed by familiar principles. Persons indicted together ordinarily should be tried together. A motion for severance is a matter within the sound discretion of the district court. "To establish an abuse of discretion the defendant must demonstrate that without severance he was unable to receive a fair trial and that he suffered compelling prejudice against which the trial court could offer no protection." United States v. Magdaniel-Mora, 746 F.2d 715, 718 (11th Cir.1984).
 
 
 60
 Antagonistic defenses may satisfy the compelling prejudice standard, but only if the defenses are "irreconcilable and mutually exclusive." Id. In United States v. Crawford, 581 F.2d 489, 491 (5th Cir.1978), a prosecution for possession of an unregistered weapon, the two defendants took the stand and each testified that the other had possessed the weapon. The court stated that "[e]ach was the government's best witness against the other," and found compelling prejudice. 581 F.2d at 492. Mere hostility between defendants, however, does not meet the compelling prejudice standard. In United States v. Vadino, 680 F.2d 1329, 1334-35 (11th Cir.1982), cert. denied, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983), one defendant argued entrapment, and admitted most of the matters asserted by the prosecution; the court ruled that such a defense did not result in compelling prejudice to the other defendants. See also United States v. Mota, 598 F.2d 995, 1000-01 (5th Cir.1979) (defense of insanity not irreconcilable with codefendant's defense of noninvolvement),cert. denied, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980).
 
 
 61
 Compelling prejudice did not exist in this case. Jernigan's counsel did admit that Jernigan was likely guilty of some crime; however, the focus of her arguments was that Harvey was the primary culprit, and that Jernigan was simply a small player in Harvey's gang. Harvey did not go to trial; appellants, therefore, hardly can argue compelling prejudice. Appellants point to only two incidents in which Jernigan's counsel implicated other defendants. First, in the course of a cross-examination regarding a phone call between appellant Cason and Jernigan, counsel asked questions concerning whether Jernigan had been giving orders to Cason. These questions simply tended to exonerate Jernigan from the continuing enterprise charge while not further implicating Cason. In her closing, counsel referred to Jernigan as "a glorified Buck Van Horn." Although a statement comparing one defendant's guilt to another's is hardly desirable, it did not result in compelling prejudice. The statement presented no evidence or argument in favor of convicting Van Horn; moreover, a jury could accept counsel's basic argument that Jernigan was simply one of many workers without necessarily finding that Van Horn, or any of the other defendants, was guilty.
 
 
 62
 We also note that neither Jernigan nor any of the appellants introduced evidence at trial. It would be unusual to find compelling prejudice from a codefendant's defense when that defense did not entail presentation of evidence. See United States v. Magdaniel-Mora, 746 F.2d 715, 718 n. 3 (11th Cir.1984). Finally, the trial court gave explicit curative instructions during counsel's closing argument, instructing the jury to consider the guilt or innocence of each defendant separately. Accordingly, we find that the appellants have not met the compelling prejudice standard and that the district court was within its discretion in denying a severance.
 
 B. Misjoinder of Appellant Sikes
 
 63
 Appellant Sikes contends that he was misjoined under Federal Rule of Criminal Procedure 8(b). The indictment contained twenty-three counts. The first two counts were continuing criminal enterprise charges against Jernigan and Harvey under 21 U.S.C. Sec. 848. Count III alleged a conspiracy to import marijuana. Count IV alleged a conspiracy to possess marijuana with intent to distribute. The remaining counts alleged various substantive violations of the marijuana laws. Sikes was named only in the conspiracy counts. The conspiracy counts included seventy-one overt acts, and named Sikes in only four of them. Sikes argues that he was misjoined because the conspiracies alleged in Counts III and IV are actually multiple unrelated conspiracies, and because the substantive counts are all unrelated to his participation.
 
 
 64
 The overt acts contained in the conspiracy counts showing participation of Sikes were discussions between Harvey and Sikes on November 18, 1980. Harvey, Sikes, and codefendant Dennis Kay discussed future marijuana off-loads, and division of profits from past sales; Harvey asked Sikes to take possession of 20,000 pounds of marijuana; Harvey and Sikes discussed a payment to a supplier; Sikes told Harvey that codefendant John Bertelsen had recently paid Sikes $125,000. The other overt acts refer to separate episodes of importation, in which Sikes is not named.
 
 
 65
 We conclude that Counts III and IV set forth a single conspiracy, in which Sikes was a member. This court has decided numerous cases involving claims of multiple conspiracies, and some simple principles are relevant. A coconspirator need not participate in every phase of the venture. Nor need a conspirator be aware of all of the participants. Three factors support a finding of a single conspiracy: common goal, common scheme, and overlapping participants. United States v. Brito, 721 F.2d 743, 747 (11th Cir.1983). The hallmark of a single conspiracy is "a regularized pattern of activity involving a significant continuity of membership and directed toward a common goal." United States v. Darby, 744 F.2d 1508, 1542 (11th Cir.1984). The indictment here shows a common goal of systematic and repeated importation and distribution of large amounts of marijuana. The indictment shows overlapping participation by the various defendants. The indictment shows a common scheme of off-loading and distribution. With specific reference to Sikes, it shows his knowledge of both off-loading and distribution, his knowledge of other members of the conspiracy, and knowledge of past, present and future activities of the conspiracy. Accordingly, Sikes was properly joined in Counts III and IV.[9]
 
 
 66
 Sikes also argues that the substantive counts, in which he was not named, were improperly joined with the conspiracy counts. A defendant need not be named in all counts of the indictment. If the substantive charges in which the defendant is not named all arise out of the same conspiracy then joinder is proper. See, e.g., United States v. Phillips, 664 F.2d 971, 1016 (5th Cir. Unit B 1981), cert. denied, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); United States v. Corbin, 734 F.2d 643, 649 (11th Cir.1984) (proper test is whether charges arise out of "series of acts or transactions" as shown by "substantial identity of facts or participants"). All of the substantive counts relate to the marijuana importation and distribution activities of the conspiracy. We have already determined that the indictment set forth a single conspiracy, in which Sikes was a member. Accordingly the conspiracy counts were not misjoined with the substantive counts.
 
 
 67
 C. Revelation of the Location and Type of Surveillance Equipment Employed
 
 
 68
 Despite numerous requests, the district court would not allow the appellants to discover either the type of microphone used in Harvey's office, or where the microphone was hidden. The appellants contend that consequently they were deprived of the right to confront the witnesses against them. The government resisted such revelations on the ground that they would adversely affect future criminal investigations. It asks us to recognize a privilege not to disclose the location and type of equipment used in surveillance unless the defendant demonstrates that such information is relevant and helpful to the defense.
 
 
 69
 We recognize a qualified government privilege not to disclose sensitive investigative techniques. In Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court acknowledged the existence of an "informer's privilege." The Court stated that the government has a privilege to withhold the identity of persons who furnish information of violations of law to the police, reasoning that the privilege furthered effective law enforcement by encouraging citizens to come forward with relevant information. 353 U.S. at 59, 77 S.Ct. at 627. The privilege must give way, however, where the informant's identity or knowledge is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." Id. at 60-61, 77 S.Ct. at 627-28.
 
 
 70
 The District of Columbia Circuit has applied the Roviaro privilege to surveillance locations. See United States v. Harley, 682 F.2d 1018, 1020-21 (D.C.Cir.1982); United States v. Green, 670 F.2d 1148 (D.C.Cir.1981). In Green, a police officer using binoculars observed the defendant committing a drug transaction. The defendant wished to identify the precise location of the officer's observation post. The court ruled that the information was privileged:
 
 
 71
 Just as the disclosure of an informer's identity may destroy his future usefulness in criminal investigations, the identification of a hidden observation post will likely destroy the future value of that location for police surveillance. The revelation of a surveillance location might also threaten the safety of police officers using the observation post, or lead to adversity for cooperative owners or occupants of the building. Finally, the assurance of nondisclosure of a surveillance location may be necessary to encourage property owners or occupants to allow the police to make such use of their property.
 
 
 72
 670 F.2d at 1155. Green was decided in the context of a motion to suppress; the District of Columbia Circuit extended the privilege to trial testimony in Harley. In Harley two officers observed a drug transaction, one using binoculars, the other video-taping it with a zoom lens. Again, the defendants attempted to learn the precise viewing location. The court held that the defendant's right to confront witnesses was not violated in light of the government's interest in keeping its surveillance post secret, and the defendant's failure to show a need for the evidence. 682 F.2d at 1020-21. In considering the defendant's need, the court reasoned that the jury could judge the observer's ability to identify by seeing the video tapes made from the surveillance spot, and from testimony of the approximate distance. See also United States v. Crumley, 565 F.2d 945, 950-51 (5th Cir.1978) (government need not reveal where "track sheet" identifying vehicle parts was hidden unless defendant shows need).
 
 
 73
 We hold that the privilege applies equally to the nature and location of electronic surveillance equipment. Disclosing the precise locations where surveillance devices are hidden or their precise specifications will educate criminals regarding how to protect themselves against police surveillance. Electronic surveillance is an important tool of law enforcement, and its effectiveness should not be unnecessarily compromised. Disclosure of such information will also educate persons on how to employ such techniques themselves, in violation of Title III.
 
 
 74
 The privilege will give way if the defendant can show need for the information. In this case the appellants contend that the information was necessary to demonstrate that the voices on the tapes could have been distorted, resulting in improper voice identifications. They insist that testimony of Agent Copus and their own expert witness indicated that the location of the microphone could have resulted in distortion.
 
 
 75
 The district court conducted an in camera hearing to review the government's assertion of privilege and held a hearing on the appellants' claim of necessity. We agree with the district court that the information was privileged and that the defendants did not demonstrate necessity. There was testimony that the voices could have been distorted by the way the microphone was hidden. The district court, however, listened to Agent Copus, who was monitored from Harvey's office during the course of the investigation and was able to compare Agent Copus' voice on the tapes with his actual voice and determine that the voice had been accurately recorded. The appellants were allowed to examine the tapes, and were informed that the transmission was by air rather than wire. The ultimate question of whether the voice identifications of the appellants were correct was given to the jury and the appellants were allowed to explore and argue the possibility of misidentification in front of the jury. Accordingly, we agree with the district court's finding that necessity was not shown in this case.
 
 
 76
 We stress that the necessity determination requires a case by case balancing process, and that we have established no fixed rules about the discoverability of electronic surveillance techniques in criminal cases. See Roviaro v. United States, 353 U.S. 53, 60, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957); United States v. Harley, 682 F.2d 1018, 1020 (D.C.Cir.1982).[10]D. Timeliness of the Government's Request for Voice Exemplars
 
 
 77
 During the eighth week of trial, the government requested that the appellants provide voice exemplars, to be played before the jury in order to confirm the identifications. Appellants Sikes and Bertelsen concede that the government had the right to compel the defendants to give exemplars, see United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), but argue that the government's request came too late.
 
 
 78
 The appellants contend that the district court's standing discovery order required the government to disclose its intention to seek voice exemplars. That order, requiring the government to disclose statements of the appellants within its "possession, custody, or control," parallels the requirements of Rule 16. According to appellants, because the government had the authority to compel exemplars, the exemplars were within its control and the government was bound to disclose that it intended to seek them. This argument is absurd. The discovery order applied to statements the government had, not statements that it could have had.
 
 
 79
 In any event, the appellants have shown no prejudice from the government's delay. They complain that they had become committed to the defense of improper identification, but they provide no alternative theory of defense which they could have presented had they known the government intended to seek voice exemplars. Indeed, in light of the contents of the tapes, improper identification appears to have been the most logical defense.
 
 
 80
 E. Admissibility of Intercepted Conversations Referring to Bertelsen's Arrest
 
 
 81
 Appellant John Bertelsen was arrested for loitering and prowling near a Coast Guard Station on October 1, 1980. Numerous other members of the conspiracy were also arrested on that day. The state Title III wiretap on Jernigan's phone intercepted conversations about the arrests, the various charges, and obtaining releases and included mention of Bertelsen's arrest. The government has conceded that the arrest of Bertelsen was unlawful. Bertelsen claims, therefore, that the conversations about the arrest should have been excluded, and that the government should not have been allowed to argue that the conversations demonstrated Bertelsen's connection with the conspiracy.
 
 
 82
 We hold that the conversations of Bertelsen's coconspirators regarding his arrest were not the product of the illegal arrest. Evidence seized during an unlawful arrest, or statements made by the person unlawfully arrested while in custody, are products of the arrest and will be suppressed. Evidence with only a loose causal connection to an illegal arrest, however, will not be suppressed. Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). The mere existence of a "but for" causal connection does not mandate suppression. Dunaway v. New York, 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); United States v. Bailey, 691 F.2d 1009, 1013 (1982), cert. denied, 461 U.S. 933, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983). In this case, the causal connection was broken by the intervening acts of third parties. The challenged evidence is not a statement made by Bertelsen, but statements made about Bertelsen by third parties. Accordingly, the evidence was not the fruit of the illegal arrest and suppression was not required.
 
 
 83
 F. Use of Prior Similar Act Evidence Against Campbell
 
 
 84
 Appellant Campbell complains that the government used similar act evidence against him in violation of a prior agreement. The evidence demonstrated that Campbell had been arrested and convicted on state marijuana charges in 1978. After the conviction, Campbell and the federal government entered into an agreement in which the government agreed not to pursue any criminal or civil liability arising out of the event; Campbell agreed to forfeit a vessel to the United States.
 
 
 85
 The use of evidence of the prior arrest did not violate the agreement. The government agreed not to pursue any charges for the events leading to the arrest. The government did not agree to never use the arrest as evidence in a prosecution for subsequent criminal activity.
 
 
 86
 G. Sufficiency of the Evidence with Respect to Convictions Under 18 U.S.C. Sec. 1001
 
 
 87
 Appellants Marion Van Horn and Gary Balough were convicted of conspiracy to make false statements in violation of 18 U.S.C. Sec. 1001. The appellants contend that there was insufficient evidence to prove that they agreed to make false statements, that the false statements were not material, and that the "exculpatory no" exception to section 1001 applies.
 
 Agreement
 
 88
 In considering the sufficiency of the evidence to convict we view the evidence in the light most favorable to the government, with all reasonable inferences drawn in favor of the jury's verdict. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). With respect to whether the appellants reached an agreement with Harvey to make false statements, the evidence is clear. The evidence disclosed that on several occasions Harvey and Van Horn discussed what Van Horn should say to the FBI and that Van Horn agreed to lie to the FBI about his connection with the conspiracy and about Harvey. Overt acts were committed in furtherance of the conspiracy: on November 21, 1980, Van Horn spoke with the FBI and told the agents that Harvey had instructed him to cooperate fully.
 
 
 89
 With respect to Balough, an intercepted conversation on November 18, 1980, provided sufficient evidence to convict. Harvey and Balough discussed what Balough should say to FBI investigators; in particular, they discussed how to portray Harvey's relationship with his girl friend Trudy Stalker. Harvey had given Stalker expensive gifts, which he feared would raise suspicion. Harvey and Balough agreed that Balough would tell agents that Stalker was a race car groupie, and that Harvey had not purchased gifts for her. They also discussed what Stalker was to say. An overt act was committed in furtherance of the conspiracy as Stalker spoke to FBI agents.
 
 Materiality
 
 90
 A statement is material for the purposes of section 1001 if it has a " 'natural tendency to influence, or be capable of affecting or influencing, a governmental function.' " United States v. Lopez, 728 F.2d 1359, 1362 (11th Cir.1984) (quoting United States v. McGough, 510 F.2d 598, 602 (5th Cir.1975)), cert. denied, --- U.S. ----, 105 S.Ct. 112, 83 L.Ed.2d 56 (1984). The statements need not have exerted actual influence, so long as it had the capacity to do so. Id. The statement that the conspirators agreed to in this case were material. Harvey was the main target of the FBI investigation, and Van Horn agreed to mislead the FBI about Harvey. The record indicates the FBI was interested in using Stalker to obtain information about Harvey, and the misstatements Balough agreed to make would have misled the FBI about Harvey's relationship with Stalker.
 
 Exculpatory No
 
 91
 The "exclupatory no" exception to section 1001 was established in this circuit in Paternostro v. United States, 311 F.2d 298 (5th Cir.1962). There the court held that section 1001 did not cover negative exculpatory responses to questions propounded by an investigating agent during a conference not initiated by the interviewee. Id. at 309. The exception is based both on the purpose of the statute and the fifth amendment right against self-incrimination. The exception therefore does not apply when a person attempts to affirmatively mislead a government investigation. United States v. Krause, 507 F.2d 113 (5th Cir.1975) (defendant used "aggressive action" to mislead NLRB investigation); United States v. Bush, 503 F.2d 813, 818 (5th Cir.1974) ("there is a valid distinction between negative exculpatory denial of a suspected misdeed and an affirmative representation of facts peculiarly within the knowledge of the suspect not otherwise obtainable by the investigator.").
 
 
 92
 The discussions between Harvey and Van Horn do not simply show an intent that Van Horn deny wrongdoing, but an intent that Van Horn lead the FBI investigation away from Harvey. On November 18, Harvey and Van Horn discussed an upcoming FBI interview, and Van Horn's denial of knowledge of involvement by Harvey. On November 21, Van Horn reported to Harvey that he had told the FBI that Harvey wanted him to cooperate. On December 30, Harvey theorized to Van Horn that the FBI would offer Van Horn immunity. They also discussed a lawyer for Van Horn; Harvey agreed to pay for one, but told Van Horn not to tell the FBI about it. Van Horn did not simply agree to deny personal wrongdoing, but to mislead the FBI about Harvey. Accordingly, the exculpatory no exception does not apply.
 
 
 93
 Similarly, the exculpatory no does not apply to Balough's agreement to lie on behalf of Harvey; Balough did not agree simply to deny connection with Harvey, but to affirmatively steer the FBI in the wrong direction.
 
 
 94
 For the reasons stated, the convictions are AFFIRMED.
 
 
 
 *
 Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 Appellant Harvey went to trial before the district court judge based on a stipulated trial transcript and was convicted. The remaining appellants went to trial and were convicted by a jury
 
 
 [2]
 The appellants contend that the FBI was not authorized to conduct surveillance in connection with narcotics offenses. Our conclusion that the affidavit set forth probable cause of a RICO violation, which the appellants admit the FBI was authorized to investigate, obviates consideration of this issue
 
 
 [3]
 The October 29, 1980, progress report stated that Harvey was expected back that day. The November 4, 1980, progress report stated that the principals were "maintaining a low profile" due to arrests by state officials, but were expected back shortly. Accordingly, there is no factual basis in the record for appellants' contention that current probable cause did not exist
 
 
 [4]
 Appellants contend this is contrary to the record because the record indicates all meetings were called by Harvey. We disagree. The affidavit indicated other employees of Delray were involved in the conspiracy. It is reasonable to infer they might converse in Harvey's office even in Harvey's absence
 
 
 [5]
 Because the agents did not "know" Harvey was named on the state Title III application, we need not consider whether a failure to completely satisfy the requirements of section 2518(1)(e) would mandate suppression
 
 
 [6]
 Appellants contend that Abramson is in conflict with United States v. Bellosi, 501 F.2d 833 (D.C.Cir.1974). Bellosi, however, was decided before the Supreme Court's decision in Donovan, and we find it unpersuasive
 Appellants contend that the omission of page 21C also relates to the section 2518(1)(c) necessity showing. They argue that section 2518(1)(c) requires a "full and complete statement" of prior investigative efforts, and that therefore any omission of a prior investigative effort requires suppression. We disagree. Such a reading of section 2518(1)(c) would render section 2518(1)(e) superfluous; section 2518(1)(e) requires that the application disclose all prior electronic surveillance "known" to the officer. Hence, appellant's "strict liability" interpretation of section 2518(1)(c) is contrary to the statutory language. We therefore analyze the omission of page 21C in the context of section 2518(1)(e). In any event, the existence of the prior state wiretap, which did not yield evidence to arrest Harvey, made the surveillance neither more nor less necessary. See United States v. Donovan, 429 U.S. 413, 438, 97 S.Ct. 658, 673, 50 L.Ed.2d 652 (1977) (suppression of electronic surveillance required only if interception was "unlawful").
 
 
 [7]
 Because we hold that the judicial approval requirement was satisfied in this case, we do not consider whether the government is correct in arguing that the indictment did not charge "offenses other than those specified in the order of authorization." 18 U.S.C. Sec. 2517(5). See, e.g., United States v. Brodson, 528 F.2d 214 (7th Cir.1975); United States v. Daly, 535 F.2d 434 (8th Cir.1976); see also infra note 8
 
 
 [8]
 Because we find that the government did not violate 2517(5), we need not consider under what situations, if any, such a violation would mandate suppression. See Vento, 533 F.2d at 855 (suggesting no suppression for 2517(5) violations)
 
 
 [9]
 Since this case was briefed, the Supreme Court decided United States v. Lane, --- U.S. ----, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), holding that misjoinder is subject to the harmless error doctrine. As we have decided that joinder was proper, we need not consider prejudice
 
 
 [10]
 The appellants also contend that the Classified Information Procedures Act, 18 U.S.C. app. iv., applies to the information they sought. Appellants are wrong. The district court did not find that the information was classified, nor do appellants provide any reason why it should have. See 18 U.S.C. app. iv Sec. 1 (defining classified information); United States v. Panas, 738 F.2d 278, 285-86 (8th Cir.1984)